Richard C. Hunt

---

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - -

RICHARD C. HUNT,                    :
   Plaintiff,                       :
               : C.A. No. 04-1417
   v.                                :
               :
FIRST CORRECTIONAL        : Jury Of 12 Demanded
MEDICAL SERVICES,           :
STAN TAYLOR & RAPHAEL    :
WILLIAMS,                          :
   Defendants.                     :

DEPONENT: Richard C. Hunt
DATE:     Thursday, October 18, 2007
TIME:     10:45 a.m.
PLACE:    Delaware Correctional Center
          1181 Paddock Road
          Smyrna, DE 19977
REPORTER: Lorraine Shickora, CRS-DEL#199
          And Notary Public

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE

Page 3

---

## INDEX

WITNESS                                    PAGE
RICHARD C. HUNT
Examination By Ms. Kelly            4, 111
Examination By Mr. Hager              97


         EXHIBITS
Exhibits 1      Report                 53

---

APPEARANCES:

RICHARD C. HUNT, Pro Se

HECKLER & FRABIZZIO, P.A.
BY: GERALD J. HAGER, ESQUIRE
800 Delaware Avenue
Suite 200
Wilmington, DE 19899-0128
(302) 573-4800

Representing Defendant First Correctional Medical Services

DEPARTMENT OF JUSTICE
BY: EILEEN KELLY, ESQUIRE
BY: CATHERINE DAMAVANDI, ESQUIRE
820 N. French Street, 6th Floor
Wilmington, DE 19801

Representing Defendants Stan Taylor and Raphael Williams

Page 2

---

MS. KELLY: As a preliminary matter, Mr. Hunt, I just want to introduce myself. I'm Eileen Kelly. I'm from the Department of Justice. I'm the Attorney General that has been handling your case for a period of time now.

This is Catherine Damavandi. She's also a Deputy Attorney General. She recently entered her appearance in your case. I'm going to be withdrawing as Counsel. She'll be handling the case on her own. Okay?

MR. HAGER: And I'm Gerald Hager. I represent FCM. I'm here for Dan McKenty who is the attorney of record for FCM, First Correctional.

MS. KELLY: And just to clarify, as you know, I'm representing Raphael Williams, Stanley Taylor and Brian Emig.

If you're ready to swear the witness . . .

. . . . . . RICHARD C. HUNT, was called as a witness, and after having been duly sworn, according to the law, was examined and testified as follows:

--EXAMINATION--

BY MS. KELLY:

Q.  I just wanted to say on the record, Mr. Hunt, that I'm Eileen Kelly, Deputy General Attorney, from the Department of Justice and I represent Defendant Stanley

Page 4

---

1 (Pages 1 to 4)

Richard C. Hunt

1  Taylor, Raphael William and Brian Emig.
2          Could you state your full name for the record.
3      A.    Richard C. Hunt or Richard Cornelius Hunt.
4  And I just want to go over a few basic things about how a
5  deposition works.  First of all, we can only talk one
6  person at a time because the court reporter can't take us
7  down if we're both speaking at once.  You need to answer
8  audibly.  She can't take down a nod or a shake of the
9  head.
10          I'm going to try to ask my questions in as
11  clear a manner as possible; however, if at any time you
12  don't understand what I've asked or if you can't hear me
13  or you're confused, let me know and I'll try to rephrase
14  it.  If you go ahead and answer I'm going to assume that
15  you understood.
16          Do you understand what I've gone over with
17  you?
18      A.    Yes.
19      Q.    Have you been known by any other names other
20  than Richard Hunt?
21      A.    Hunt.
22      Q.    Okay.  Are you on any medications today?
23      A.    Yes.
24      Q.    What are they?
25      A.    The correct word -- I know it's Ultram but I

Page 5

1      Q.    And in July of this year is when you injured
2  your wrist?
3      A.    Yes.  No, last year.  Last year.  '06.
4      Q.    You hurt your wrist --
5      A.    July 14, '06.
6      Q.    Oh, you hurt your wrist a year ago?
7      A.    Yeah.
8      Q.    How often do you take Ultram?
9      A.    I was taking it 4:30 in the morning, 9:00 in
10  the morning, 9:30, 4:30 and then 9:30.
11      Q.    You were?
12      A.    Yes.
13      Q.    And how often are you taking it now?
14      A.    I take it now 4:30 at night and 4:00 in
15  evening because due to the security like the way they do
16  it they only come twice a day.  Like on the compound I can
17  go to the window four times if I have to.
18      Q.    When you were taking Motrin, just the Motrin,
19  how often did you take that?
20      A.    They give you like a prescription for like 90
21  days.  You can have them like a tray of them.  So I took
22  them as needed like two - three times, you know what I
23  mean, a day.
24      Q.    Are you on any other medicine?
25      A.    I was taking Sinequan that was like for

Page 7

1  don't know it's like medical full name.
2      Q.    Okay.  Do you know what it's for?
3      A.    For pain.
4      Q.    What kind of pain are you having that would
5  require you to take medicine?
6      A.    I'm still having like little pain in my jaw
7  where it got broke at right here and for my wrist, my left
8  wrist.
9      Q.    What happened with your wrist?
10      A.    Accident playing basketball.  I fell and
11  sprained it real a bad.  But I initially was on it for my
12  jaw.
13      Q.    And when did you start talking the Ultram?
14      A.    Last like I think it's like January last year.
15      Q.    So that would have been January of '06?
16      A.    Yes; but I was -- I was on -- I was taking
17  Motrin -- Motrin, until they moved me up another pain,
18  like that's the second step after the Motrin.
19      Q.    So last year you were taking Motrin not
20  Ultram?
21      A.    Uh-huh.
22      Q.    And when did you switch over?
23      A.    Around like July when this happened it was
24  move excruciating pain so I had to -- they had to give me
25  more, you know, to help this and my wrist.

Page 6

1  depression.
2      Q.    Are you taking that anymore?
3      A.    No.  Due to the fact that it had been conflict
4  medication from Ultram because Ultram is basically a
5  narcotic that you got to have prescribed from the doctor.
6  Like Motrin is over-the-counter.  You can just have it.
7      Q.    Are you taking anything else now besides the
8  Ultram?
9      A.    No, I'm not.
10      Q.    Does the Ultram affect your ability to testify
11  today?
12      A.    It puts you on a high.
13      Q.    So --
14      A.    But I'm just like -- I -- you get used to it.
15      Q.    Do you feel you're able to testify today?
16      A.    Yeah.
17      Q.    Have you ever had your deposition taken
18  before?
19      A.    No; just the written ones.
20      Q.    You mean just the written discovery?
21      A.    Yeah.
22      Q.    Have you ever filed a civil lawsuit other than
23  the one we're here for today?
24      A.    No, I have not.
25      Q.    What's your date of birth?

Page 8

2 (Pages 5 to 8)

Richard C. Hunt

1 got assaulted by another guy and per Carmen Davis I
2 said my cellie stole me, he sucked punched me. You
3 really think they would put me back in the same cell
4 with the guy? Where is the -- where is the
5 disciplinary write-up on the cellie who did it,
6 supposedly? I know Brian Emig, CO Brian Emig broke
7 my jaw September 17th, '04. I know he did that.
8      MS. KELLY: Okay. I understand what you're
9 saying. You done with that? Can you give it back to
10 the court reporter.
11      THE WITNESS: So you all basically was
12 using that for -- that was going to be her testimony
13 whatever but either way, you know what I'm saying.
14 BY MS. KELLY:
15    Q.   Mr. Hunt, you're in the infirmary on Sunday
16 after you had your pictures taken.
17    A.   What date was that? I didn't catch that date?
18 See, Queener -- this is 21th, right? September 20th.
19 September 20th I seen doctor. I went and seen the doctor
20 so I didn't even -- why would I talk to Carmen Davis?
21 She's not a doctor. I went to see a doctor.
22    Q.   You're saying that that's dated the 20th?
23    A.   Yes.
24    Q.   The document Exhibit 1.
25    A.   Yeah. September 20, 2004. I didn't see

Page 57

1    A.   I'm going to say this. If I told her while
2 Lieutenant Queener was present, which he was on that
3 paper, he said he was present on the 20th or whatever it
4 was because they got those dates wrong, wouldn't it look
5 like -- wouldn't it be if I told you one thing, you the
6 nurse and you're Lieutenant. I tell you, Yo, the CO hit
7 me. Then I tell you while you're there that a inmate hit
8 me, my cellie stole me, wouldn't you think -- hold up.
9 Let me slow -- you know what I mean? Why would -- and
10 then my whole thing is where is the disciplinary -- where
11 is the disciplinary for fighting? You know, I see she
12 have it on that paper as far as the like the infraction
13 for one something for fighting and then it's like who was
14 I fighting, you know, I don't . . .
15    Q.   I understand what you're saying.
16    A.   But back to your question. I've seen the
17 doctor Diane Hernandez.
18    Q.   Well, on Sunday when you were in the infirmary
19 did she give you any medicine? Did she examine you? What
20 did --
21    A.   She just -- she just looked at me because per
22 her, Carmen Davis, I seen her already.
23    Q.   Right.
24    A.   So why would she be looking at me again?
25    Q.   No. On Sunday. You said you didn't know the

Page 59

1 Carmen. I went -- I only seen Carmen basically that night
2 the 17th, September 17th. I seen the doctor on the 20th
3 so there's no need to talk to the nurse anymore because
4 they -- when I talked to Lieutenant Queener, yeah, he said
5 they will put you down to see the doctor tomorrow when
6 they come in. So that next morning I didn't see Carmen;
7 for what? She's just basically pass out medication. I
8 seen the doctor.
9    Q.   On the 20th?
10    A.   Yeah, on the 20th. That's when they took the
11 X-rays and they said your jaw is broken.
12    Q.   Are you done with that now?
13    A.   Yeah.
14    Q.   So on the 19th on Sunday you're in the
15 infirmary with a nurse.
16    A.   Sunday?
17    Q.   Yeah. Sunday this would have been --
18    A.   19th.
19    Q.   19th. You were in the infirmary and there was
20 a nurse there. Was there a doctor?
21    A.   No.
22    Q.   What did the nurse do?
23    A.   She basically -- I told her what happened to
24 me as far as -- it's --
25    Q.   Well . . .

Page 58

1 name of the nurse on Sunday. And when you were there with
2 Lieutenant Queener you said you were explaining to her
3 what happened.
4    A.   I don't know her name. I know she's a, you
5 know, a white lady.
6    Q.   Did she do anything for you medically?
7    A.   No. She just looked at it, looked at my jaw
8 because it's like this and she just -- just like that and
9 I told her about my tooth.
10    Q.   Did she look in your mouth?
11    A.   No; because it was -- it was hurting to open
12 it.
13    Q.   And were you admitted to the infirmary?
14    A.   And 20th after I seen the doctor.
15    Q.   So on the 19th you just go back to your cell?
16    A.   Yeah. They put me back in the room with
17 nothing.
18    Q.   You weren't given any medicine or anything?
19    A.   No medicine, nothing.
20    Q.   Then on the 20th which is Monday and were you
21 taken to the infirmary at that point?
22    A.   Yes.
23    Q.   Do you remember what time of day it was?
24    A.   I believe it was 9 something.
25    Q.   It was in the morning?

Page 60

15 (Pages 57 to 60)

Karasch & Associates
800-621-5689

Richard C. Hunt

Page 61

1   A.   Yes, it was in the morning.
2   Q.   And who were you seen by then?
3   A.   Dr. Hernandez.
4   Q.   Doctor?
5   A.   Diane Hernandez
6   Q.   Hernandez?
7   A.   Yeah.
8   Q.   Oh, you have it in your paperwork.
9   A.   Yeah.
10  Q.   Okay. I got it. Diane. Right?
11  A.   Uh-huh.
12  Q.   And did she examine you? What did she do?
13  A.   She -- she felt my jaw, whatever. It was real
14  swollen and what I was worried about was my tooth because
15  it -- a piece broke off in my mouth and it stuck -- it
16  stuck in my gum, you know what I mean, because I'm
17  thinking, Oh, that's going to get infected or something
18  like that. You know what I mean? So I'm like, Yo, can
19  you -- you know what I mean, I need -- can you let me see
20  a dentist or somebody or something. She was like I'm
21  going to get your jaw X-rayed first. So they put me in a
22  -- in this little thing. They X-rayed my jaw. Then we
23  waited for a minute. Then she came back, Oh, your jaw is
24  broken.
25       See, because everybody -- because now it's

Page 62

1   through the prison. Everybody, you know, oh, you know,
2   the guy broke the guy jaw, you know, because I'm telling
3   everybody. Yo, CO broke my jaw. You're not going to, you
4   know what I mean, do that to me and let me sit there.
5   Q.   You told the doctor about what happened?
6   A.   Yeah. I told her, Yo. She said, What
7   happened? I didn't really go into specifics like that. I
8   just told her my jaw had been broken, you know, by a CO.
9   That's it.
10  Q.   And the X-ray was done there in the infirmary?
11  A.   Yes.
12  Q.   Do you remember what time that was done?
13  A.   Between 9; 9 and 10.
14  Q.   And you said she told you shortly thereafter
15  that your jaw was broken?
16  A.   Yes.
17  Q.   And then what happened?
18  A.   She admitted me to the infirmary and put me on
19  a liquid diet and some antibiotics -- I don't know what
20  the medication was. I know it was like a pink pill, like
21  a pink pain pill. From -- I went there. She admitted me
22  September 20th, '04.
23  Q.   Before she gave you any medicine how was your
24  jaw feeling?
25  A.   It was hurting. I was glad to see her.

Page 63

1   Q.   Did the pills that she gave you help it feel
2   any better?
3   A.   No. I'm thinking they -- I'm thinking with a
4   broke bone they supposed to take me straight out. They
5   going to take me out because she say your jaw is broken.
6   She said right here, it was broke right here. This was
7   broken like broke in two like.
8   Q.   And you're pointing to --
9   A.   Left side of my jaw.
10  Q.   Left jaw?
11  A.   Left mandible.
12  Q.   Lower part.
13  A.   Lower part by my chin.
14  Q.   Okay. It's kind of closer to your mouth than
15  to your ear I guess.
16  A.   Yeah.
17  Q.   So you were admitted and put on a liquid diet
18  and you were staying there?
19  A.   Yes.
20  Q.   And how long were you in the infirmary?
21  A.   Well, I have here in my other papers I got --
22  when I came down here they lost a lot of my paperwork.
23  Q.   When you came to DCC?
24  A.   DCC February 23rd so I had to write the Judge
25  and ask for I think an extension of something that I had

Page 64

1   to put in because they didn't bring all my stuff down here
2   and a lot of my paperwork got took. And what I was
3   looking for was my medical, like I wrote my medical record
4   like for myself.
5   Q.   You took notes?
6   A.   Every day. Yeah, I took notes every day what
7   they told me. I had that in my room. I wrote everything
8   they said down and I really couldn't get copies and they
9   didn't even send -- they didn't send it. They sent it
10  real late. You know what I mean? So I really haven't got
11  copies of it. I just got it so they -- of my medical
12  history.
13  Q.   So you're saying that while you were in the
14  infirmary you took your own notes about what was going on.
15  A.   Yes. I asked him everything.
16  Q.   Do you have that now?
17  A.   Yes. Not on me. It's --
18  Q.   Could you provide Ms. Damavandi with a copy of
19  that?
20  A.   Yeah.
21       MR. HAGER: And me too, please.
22       THE WITNESS: Yeah; because I wrote
23  everything down what they told me. Every time I just
24  -- slow it back. So I'm in the infirmary. I stayed
25  there till like -- like December '04 because I had to

16 (Pages 61 to 64)

Richard C. Hunt

1  get wired up so she said the 20th -- Dr. Diane
2  Hernandez said the 20th she put in the causastlation
3  [sic] whatever it's called.
4  BY MS. KELLY:
5      Q.  Consultation request?
6      A.  Yeah.  To go out to the hospital.  So that was
7  like the same day she put it in and she was like, Well,
8  it's up to security to let you out to take you to the
9  hospital, it's up to security.  So and this was the 20th,
10 September 20th.  So I wrote -- if you look I got a medical
11 grievances asking them why they're not sending me to --
12 sending me to the outside hospital.
13     Q.  I'm asking you do you have anything?
14         MR. HAGER:  Pardon me?
15         THE WITNESS:  I'm asking you do you have
16 anything on me putting in grievances --
17         MS. KELLY:  I have a grievance here --
18         THE WITNESS:  -- October I think the 8th,
19 around that time because that whole time I'm asking
20 them is you all going to get me to the hospital, is
21 you going to get me to the hospital?
22 BY MS. KELLY:
23     Q.  What were you told?
24     A.  I was told that you're waiting on a -- it's up
25 to security to let you go.

Page 65

1  grievance dated 10/14/04 and as an Exhibit but the
2  number is cut off at the bottom of the copy that I
3  have.
4         MS. KELLY:  That's attached to the
5  Complaint.
6         MR. HAGER:  Attached to the Complaint,
7  correct.
8  BY MS. KELLY:
9      Q.  Do you have that?
10     A.  Because I know I got it.  I'm saying I know I
11 got it but I just can't --
12     Q.  If you can't find it you can send it to me
13 later if you find it later.
14     A.  I know you have it already because I put it --
15 I put it with my initial Complaint.
16         MS. KELLY:  Maybe it's --
17         MR. HAGER:  It's not in the Complaint that
18 I ever seen.
19         THE WITNESS:  Like they violating my
20 constitutional right.
21         MS. KELLY:  It might be with the . . .
22         THE WITNESS:  Because was I telling them
23 that they not, you know, they not letting me --
24 they're not taking me out to the hospital because my,
25 you know what I mean, it took them a whole month to

Page 67

1         MS. KELLY:  I don't know that I have that.
2  Did you --
3         MR. HAGER:  I have this but I can't make
4  out what that is.
5         THE WITNESS:  Oh, that's not it.
6         MS. KELLY:  It would be on a grievance
7  form.
8         MR. HAGER:  I don't have that grievance.
9         MS. KELLY:  I have the initial grievance
10 from September 18.
11         THE WITNESS:  Yeah, and I got --
12 BY MS. KELLY:
13     Q.  You're saying that you did one in October; is
14 that right?
15     A.  Yeah.  I put in a medical grievance asking
16 them why they didn't put me to -- take me to the hospital
17 at the time.
18         MR. HAGER:  I have an October grievance
19 that doesn't have --
20         THE WITNESS:  Where is it?  Let me see it.
21         MR. HAGER:  October 15th.
22         THE WITNESS:  No.  That was when -- that
23 was a grievance on the guard not coming to my door
24 saying whatever he was saying to me.
25         MR. HAGER:  For the record that's the

Page 66

1  get me to the hospital.  From -- it happened
2  September 17th, they found out it was broke the 20th,
3  they didn't get me out till the 18th of October to
4  get my jaw wired.
5         This is not even half the papers that I
6  got.  I don't know why I don't have it in here.
7         MS. KELLY:  I'm not saying that I
8  definitely don't have it, but I can't find if I have
9  it.  I don't see it attached to the Complaint.
10        MR. HAGER:  No, I didn't see it attached to
11 my Complaint either.
12        MS. KELLY:  No.  If you can't find it now
13 --
14        THE WITNESS:  Yeah.  I'll find it for you.
15        MS. KELLY:  -- then you can send it to me
16 and to Ms. Catherine Damavandi and to Mr. Hager, that
17 would be good, if you find it.
18        THE WITNESS:  Because I know I wrote it
19 because if I got it it was attached with this.  These
20 is like old motions for appointment of counsel so,
21 most of these.  But I got it.  It ain't with me right
22 now.  I got it so I'll send that to you.
23        MS. KELLY:  To Ms. Damavandi.
24        MR. HAGER:  And to me, please, Gerald
25 Hager.

Page 68

17 (Pages 65 to 68)

Richard C. Hunt

1  X-ray that my jaw was broken?
2      Q.   If you want to put something in writing, you
3  know, asking for discovery or information.
4      A.   I'm asking you: Did you see anything?
5      Q.   I haven't, you know, I'm not real -- I'm not
6  so familiar with the medical file that I would feel
7  comfortable answering.
8      A.   But have you seen it?
9      Q.   No. I'm here to ask the questions, not answer
10 them. If you want to ask questions you're going to have
11 to do it in writing.
12     A.   I'm saying I thought this was, you know, oh, I
13 just -- I'm just . . .
14     Q.   All right. At some point I guess you said
15 your jaw hurts you sometimes now; is that right? I don't
16 want to put words in your mouth.
17     A.   Uh-huh.
18     Q.   How long has it been feeling the way it feels
19 now?
20     A.   It had been feeling like that since it happen.
21 My jaw ain't been right since it happen.
22     Q.   All right. But at some point did it improve
23 somewhat? I know you said you were in a whole lot of pain
24 in December.
25     A.   It healed up. The bone healed up, you know,

Page 89

1  but it's like it attached itself but I'm loosing bone mass
2  around and my teeth so I'm like, you know.
3      Q.   Are you able to eat okay?
4      A.   Some foods. Like really I don't eat candy no
5  more because it's like if I eat that I bite it it hurt.
6      Q.   Is there anything else you're unable to eat?
7      A.   Pretty much eat everything else soft, you
8  know. If I apply too much pressure to it it really hurt.
9      THE WITNESS: If I'm correct, right, I have
10 to -- if I want to ask you guys questions I have to
11 write it down first.
12     MS. KELLY: Right. Because we're not here
13 -- it's not really -- we're here to ask you
14 questions. That's the point of the deposition. It's
15 not really like a regular conversation.
16     THE WITNESS: Right, right, right.
17     At any point are you going to say anything?
18     MS. KELLY: Well, I'm sort of designated --
19 we're not supposed to kind of, you know, tag team
20 you.
21     THE WITNESS: Right, right. But I'm saying
22 as far as the medical side shouldn't he ask
23 questions?
24     MS. KELLY: He'll have a chance to ask
25 questions. I'm trying wrap it up actually because I

Page 90

1  know I've been going on for a really long while.
2      THE WITNESS: I knew he was going to do
3  your thing but . . .
4      MS. KELLY: Mr. Hager will get a chance to
5  ask questions as well.
6  BY MS. KELLY:
7      Q.   Now I understand why you've sued Officer Emig
8  because there was that incident at Howard Young where
9  you're saying that he broke your jaw. I wanted to know
10 why you've named Stan Taylor as a Defendant in this
11 lawsuit.
12     A.   Well, one, nothing was done about it. I wrote
13 him. I basically -- you got a chain of command he said,
14 so I wrote him. He sends a letter to, you know, he sent a
15 letter to Raphael Williams. So they knew about it but
16 they neglected to do anything about the whole situation.
17 They saying I was fighting. They said I was in a fight or
18 nothing happened then, they saying -- I'm saying that I
19 was assaulted by a officer, nothing happened so, come on,
20 that's like . . .
21     Q.   So you wrote to Stan Taylor about the incident
22 with Officer Emig?
23     A.   Yes. I have that. You've seen that?
24     Q.   Well, I've seen the response from Warden
25 Williams.

Page 91

1      A.   You haven't seen -- you didn't see the letter?
2      Q.   The letter from Warden Williams?
3      A.   Yeah, that I wrote.
4      Q.   Yes. That's attached to your Complaint. I
5  have that.
6      A.   Yeah; because I made sure I put everything
7  that I done when I put the 1983 form in.
8      Q.   Now you never met former Commissioner Taylor,
9  have you?
10     A.   No, I haven't.
11     Q.   Have you ever spoken with him?
12     A.   No, I haven't.
13     Q.   But you wrote to him that one time?
14     A.   Yes. I heard -- I heard that -- I was told,
15 you know, by other inmates and a couple guards that -- to
16 write him.
17     Q.   Did you write to him about your medical
18 concerns later on or did you just write about the assault?
19     A.   I just wrote him about the assault.
20     Q.   And he wasn't there, right, when that
21 happened?
22     A.   No. When have he come to prison?
23     Q.   What?
24     A.   When have you seen or heard of him coming to
25 prison?

Page 92

23 (Pages 89 to 92)

Richard C. Hunt

| | |
|---|---|
| 1    **Q.**   I wouldn't know.  Is there any other --<br>2  anything else you want to tell me about why you've named<br>3  Stan Taylor as a Defendant in this lawsuit?<br>4    **A.**   I'm saying mainly like through other case law<br>5  that I've read, you know, I, you know, you name them.  You<br>6  know what I mean?  You go from the top to the bottom and<br>7  you basically -- sue basically -- they feel -- if they --<br>8  I'm under their care.  You know, he's the commissioner of<br>9  prisons and Stan Taylor, I mean, Raphael Williams the<br>10  warden, he was the warden.  I'm in his care.<br>11    **Q.**   So that was my next question as to why you've<br>12  sued Warden Williams.<br>13    **A.**   He knew about it and neglected to do anything<br>14  about it.<br>15    **Q.**   He knew after it happened about the incident<br>16  with CO Emig.  I mean, I have the letter from him attached<br>17  to your Complaint --<br>18    **A.**   Yes.<br>19    **Q.**   -- that he responded in follow up to your<br>20  letter to Stan Taylor.<br>21    **A.**   Uh-huh.<br>22    **Q.**   Did you ever communicate with him about the<br>23  medical issues?<br>24    **A.**   Whatever that was in that letter that's what<br>25  Raphael got, Raphael Williams got.<br><div align="right">Page 93</div> | 1  just your points, you know, so I only like recently talked<br>2  to Leroy McKenzie.<br>3    **Q.**   Where is he?<br>4    **A.**   He's home now.  I seen him in D west on the<br>5  same tier with him.  I'm thinking -- I think May of this<br>6  year.  I didn't really . . .<br>7    **Q.**   Did he say that he would testify for you?<br>8    **A.**   Yeah.<br>9    **Q.**   Is there anybody else on here that you talked<br>10  to?<br>11    **A.**   I haven't.  A lot of these -- a lot of the<br>12  guys they was up Gander at the time.<br>13    **Q.**   Okay.  What about have you talked to any other<br>14  medical providers about testifying for you?<br>15    **A.**   The paper you sent where you stated that<br>16  Carmen Davis would be, I knew she was WCI.  She's over<br>17  there but . . .<br>18    **Q.**   Do you have Mr. McKenzie's address?  Do you<br>19  know where he is now?<br>20    **A.**   No.  If they found it they would write you up<br>21  for unauthorized communication so . . .<br>22    **Q.**   But he was in D west.<br>23    **A.**   Yes.<br>24    **Q.**   I can't remember what you said.  When was he<br>25  there?<br><div align="right">Page 95</div> |
| 1    **Q.**   Have you ever met Warden Williams?<br>2    **A.**   No.  You don't see them people.  You know, he<br>3  could be in another room, you would never know he there.<br>4    **Q.**   Okay.  In your Discovery responses your<br>5  Answers to Interrogatories --<br>6    **A.**   Which one?  Oh, yours?<br>7    **Q.**   The ones that you responded to me.  It's DI<br>8  55; docket item 55.  It's this.  Do you have it?  Are we<br>9  looking at the same thing?<br>10    **A.**   Yeah.<br>11    **Q.**   I know then you said that you had talked to<br>12  Dr. D'Amico about testifying if you needed him to and he<br>13  indicated that he would do that.  Is this what you said?<br>14    **A.**   Uh-huh.<br>15    **Q.**   Have you talked to any other of the witnesses<br>16  you've listed here about them testifying?  Have you asked<br>17  anybody else?<br>18    **A.**   See, they basically isolated me.  When I came<br>19  here, DCC February 23rd, '05 they put me where I'm at now.<br>20    **Q.**   In Shu?<br>21    **A.**   Yeah.  They put me in the Shu.<br>22    **Q.**   Okay.<br>23    **A.**   Saying my points was high.  They got this<br>24  point system where if your points high they put you in<br>25  here even if you're not a threat but they just -- that's<br><div align="right">Page 94</div> | 1    **A.**   May.<br>2    **Q.**   This past May?<br>3    **A.**   Yeah.  He went home.<br>4    **Q.**   Do you know what town he lives in?<br>5    **A.**   Like Newark, Delaware.<br>6    **Q.**   Do you know -- in your Interrogatory Answers<br>7  you gave the names of a bunch of people and I think a lot<br>8  of these were inmates.  Do you know where any of those<br>9  people are now or you just know that they were with you<br>10  three years ago?<br>11    **A.**   Yeah.<br>12    **Q.**   What you need to do is if at some point you<br>13  get an address for these people you need to give that to<br>14  the attorney for Defendant because they have -- they need<br>15  to have the opportunity to depose them if you know where<br>16  they are.  We don't know where they are so . . .<br>17    **A.**   I'm basically isolated from anything.  I can't<br>18  even get to the law library if I want to.  I would have to<br>19  wait a week and a half to even get a response to anything.<br>20    **Q.**   Okay.  Well, in the event that you were to<br>21  find out, you would need to let us know.<br>22    **A.**   Yeah, I would have to let you know.<br>23    MS. KELLY:  I don't know, Mr. Hager, if you<br>24  want to go ahead and ask questions and I check while<br>25  you're doing that and see if Catherine has anything<br><div align="right">Page 96</div> |

<div align="right">**24 (Pages 93 to 96)**</div>