IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD C. HUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 04-1417-GMS |
| ) | |
| BRIAN EMIG ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **MEMORANDUM**

### I. INTRODUCTION

On May 18, 2006, Richard C. Hunt ("Mr. Hunt") filed suit against Brian Emig ("Mr. Emig") alleging that Mr. Emig used excessive force against him during an altercation on September 17, 2004. (D.I. 177 at 1-2; D.I. 179 at 1.) Mr. Hunt alleges that Mr. Emig broke Mr. Hunt's jaw in the process. (*Id.*) On March 10, 2011, Mr. Hunt amended his complaint. (D.I. 93.) In his amended complaint, Mr. Hunt alleged that Mr. Emig violated Mr. Hunt's Eighth Amendment rights, actionable under 42 U.S.C. § 1983, and committed battery under Delaware law by striking Mr. Hunt in the jaw. (D.I. 93 at ¶¶ 20-27.) On October 21, 2013, a three-day trial of the issues in this case commenced. (D.I. 174.) At the conclusion of the trial, the jury rendered a verdict in favor of Mr. Emig. (D.I. 173.) Presently before the court is Mr. Hunt's Motion for a New Trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure ("Rule 59(a)"). (D.I. 176.) For the reasons that follow, the court will deny the motion.

### II. BACKGROUND

Since the court writes primarily for the parties' benefit and the parties are privy to all of the facts that have given rise to this case, the court will discuss only the most important and relevant facts. In September 2004, Mr. Hunt was incarcerated at the Howard R. Young

Correctional Institution ("HRYCI") in Wilmington, Delaware. (D.I. 177 at 4; D.I. 179 at 4.) On September 17, 2004, Mr. Hunt was housed in Cell #11 of Housing Area 2A ("2A") of the HYRCI. (D.I. 177 at 4; D.I. 179 at 4.) During the 4:00 p.m. to 12:00 a.m. shift on that day, Mr. Emig was originally assigned to 2A as a housing officer. (D.I. 177 at 4; D.I. 179 at 4.) During the same time period, a group of correctional officers known as the "security team" was scheduled to conduct checks of the inmates' cells. (D.I. 177 at 4; D.I. 179 at 4.) On the evening of September 17th, Mr. Emig was reassigned to assist the security team and arrived at Cell #11, where Mr. Hunt was housed, to conduct a security check. (D.I. 177 at 4; D.I. 179 at 4.) From this point on, the parties' accounts diverge. Throughout the duration of this matter, Mr. Hunt has maintained, with some variations, that Mr. Emig swept his hand over the top of the cell door and brushed dirt into a bowl that Mr. Hunt had been holding. (D.I. 177 at 5.) Mr. Hunt has claimed that when he turned to complain to his cellmate about Mr. Emig's actions, Mr. Emig punched him in the jaw and knocked him to the ground. (*Id.*) For his part, Mr. Emig has contested Mr. Hunt's account and has insisted that nothing out of the ordinary occurred during his check of Mr. Hunt's cell. (*See, e.g.*, D.I. 179 at 4.) Ultimately, after a three-day trial, the jury accepted Mr. Emig's version of events and found in favor of Mr. Emig.

Among the issues raised in the trial were the injuries that Mr. Hunt sustained. Mr. Hunt claimed that he suffers gum disease to this day as a result of the jaw fracture. (D.I. 177 at 6-7.) In order to corroborate this, Mr. Hunt sought treatment in November 2007 from a dentist, Dr. Cathy Kionke. (*Id.* at 7.) Dr. Kionke drafted her findings in a report dated November 21, 2007, an excerpt of which Mr. Emig introduced on the third day of trial as Exhibit D-14. (D.I. 172 at 77; D.I. 177 at 7; D.I. 179 at 5.) Counsel for Mr. Hunt objected to the introduction of Exhibit D-

14 arguing that it was work product prepared in anticipation of litigation. (D.I. 172 at 78.) As support for his argument, Mr. Hunt's attorney pointed to a portion of Exhibit D-14 in which Dr. Kionke wrote "[p]atient explains that he is currently in lawsuit and wants to document that his gum disease was related to having a broken jaw that was untreated for a month."[1] (*Id.* at 78.) The objection made on the third day of trial was the first time that Mr. Hunt had asserted that Exhibit D-14 was protected by the work product doctrine. (*Id.* at 79.) The court overruled Mr. Hunt's objection and concluded that the work product doctrine did not protect Exhibit D-14. (*Id.* at 82-83.) Accordingly, the court permitted Ms. Colleen Bell, the Director of the medical and dental department at HRYCI, to read from Exhibit D-14 in front of the jury. (*Id.* at 84–85.)

## III. STANDARD OF REVIEW

Regarding a jury trial, Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Whether or not to grant a motion for new trial is entirely within the court's discretion. *See, e.g., Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court."); *Rumanek v. Indep. Sch. Mgmt.*, Civ. Action No. 12-759-SRF, 2014 U.S. Dist. LEXIS 75035, at *4 (D. Del. Jun. 3, 2014) ("The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to

---

[1] Dr. Kionke's full statement was: "Patient explains that he is currently in lawsuit and wants to document that his gum disease was related to having a broken jaw that was untreated for a month. Told him it has nothing to do with that. They are completely unrelated."

3

the prevailing party.") A jury's verdict should be set aside "only if manifest injustice will otherwise result." *Consumer Powers Co. v. Curtiss-Wright Corp.*, 780 F.2d 1093, 1097 (3d Cir. 1985); *see also Bullen v. Chaffinch*, 335 F. Supp. 2d 342, 347 (D. Del. 2004) (Indicating that the court should consider whether "a new trial must be granted to prevent a miscarriage of justice.")

Although Rule 59 does not elaborate on the reasons for which the court may grant a new trial, the following are some grounds on which new trials have often been granted: excessive damages awarded, substantial trial errors, improper use of peremptory challenges, and a verdict against the clear weight of the evidence. *See, e.g., Bullen*, 335 F. Supp. 2d at 347 (A new trial is appropriate where "the jury's verdict is against the clear weight of the evidence" or "(1) damages are excessive, (2) substantial trial errors were made; or (3) a party has improperly used peremptory challenges...."); *see also Woodson v. Scott Paper Co.*, 109 F. 3d 913, 936 (3d Cir. 1997) (reversing the district court's denial of a motion for new trial because of errors in the jury instructions); *Levy v. Schmidt*, No. 12-4051, 2014 U.S. App. LEXIS 13333, at *20 (3d Cir. Jul. 14, 2014) (discussing the circumstances under which a district court should grant a new trial because the verdict was contrary to the weight of the evidence).

## IV. DISCUSSION

Mr. Hunt asserts that Exhibit D-14 is work product entitled to protection under Rule 26(b)(3) ("Rule 26") of the Federal Rules of Civil Procedure because he "sought out Dr. Kionke to act as an expert in his then-pending litigation against Mr. Emig and others," (D.I. 177 at 11), and the exhibit thus memorialized "an attempt by Mr. Hunt to prepare his case for trial by seeking expert opinion testimony as to the cause of his gum disease," (*Id.* at 12). Mr. Hunt's arguments based on the work product doctrine are problematic for several reasons, some of

4

which Mr. Emig points out.[2] The court need not resolve whether Exhibit D-14 is work product protected by Rule 26, however, because Mr. Hunt has failed to establish that the admission of Exhibit D-14 at trial was not harmless error. Even when an error is made at trial, it is well established that a proper jury verdict should not be disturbed if it is unlikely that the error changed the outcome of the case. *See, e.g., Solvay, S.A. v. Honeywell Int'l, Inc.*, 886 F. Supp. 2d 396, 409 (D. Del. 2012) (declining to set aside jury verdict where error did not affect outcome of the case); *Lab. Skin Care, Inc. v. Limited Brands, Inc.*, Civ. Action No. 06-601-LPS, 2011 U.S. Dist. LEXIS 100786, at *22-23 (D. Del. Sept. 8, 2011) (same).

Mr. Hunt argues that the issue at the heart of the case was his credibility in comparison to Mr. Emig's trustworthiness. (D.I. 177 at 13 (Explaining that "Mr. Emig's use of Exhibit D-14 directly attacked Mr. Hunt's credibility as a witness, which was *the key factor* in the jury's determination.") (Emphasis in original.).) He further argues that, as "the opinion of a medical expert that was purportedly contrary to Mr. Hunt's trial testimony," Exhibit D-14 created the impression that Mr. Hunt was not credible and had "a devastating and irreparable effect on the jury's view of Mr. Hunt's credibility." (*Id.*) As Mr. Emig points out, however, "the great weight of the evidence in this case demonstrated that [Mr. Hunt]'s testimony was not credible, of which Exhibit D-14 played a small part." (D.I. 179 at 11-12.)

Mr. Hunt's testimony at several points during the trial was inconsistent. The court will expand on just a few of these instances. Mr. Hunt claimed a near perfect recall of the events of September 17th, explaining that "as far as the situation itself, I know pretty much everything."

---

[2] For instance, Mr. Emig argues that Exhibit D-14 is a medical record created in the ordinary course of business and, consequently, is excluded from the definition of work product. (D.I. 179.) Mr. Emig also points out that Mr. Hunt waived the work product privilege by failing to make a timely objection during both discovery and trial. (*Id.* at 9-11.)

(*Id.* at 166.) On cross examination, however, he claimed he could not recall or contradicted himself on basic matters such as his cellmates' names and the number of inmates who supposedly informed him that they saw Mr. Emig strike him. (*Id.* at 169, 174, 178-79, 187-89; D.I. 175 at 8-12, 14-15.) He also contradicted himself regarding matters such as whether he informed an Area Lieutenant that an officer struck him and to whom he gave a missing sick call slip that he claimed to have completed regarding his injury. (*Id.*)

In another instance, Mr. Hunt testified on direct examination that Mr. Emig caused the confrontation between them by brushing dust into Mr. Hunt's bowl from the top of the doorframe in Mr. Hunt's cell. (*Id.* at 197-98.) On cross examination, however, Mr. Hunt was obliged to admit that officers regularly examined his cell by running their hands over the doorframe, among other things. (*Id.* at 198.) As Mr. Emig's counsel pointed out convincingly, (*Id.*), this admission undermined Mr. Hunt's claim that enough dust had accumulated atop the doorframe to visibly fall into his bowl when Mr. Emig conducted his search.

In yet another contradiction, Mr. Hunt testified that an officer called a code after Mr. Emig supposedly struck him. (D.I. 174 at 159; D.I. 175 at 5-6.) This would suggest that there was indeed an incident. On cross examination, however, counsel for Mr. Emig introduced Defendant's Exhibit 10, a grievance document that Mr. Hunt filed and signed on September 17th, the date on which he claims Mr. Emig struck him. (D.I. 174 at 160.) In Defendant's Exhibit 10, Mr. Hunt wrote that the officer "didn't call no code." (*Id.* at 161.) Likewise, Mr. Hunt also wrote in Defendant's Exhibits 6 and 11—additional statements that he drafted on the night of

September 17th—that there was no code called.³ (*Id.* at 162-65.) Mr. Hunt further admitted at trial that he had stated during an interview with an Internal Affairs investigator that there was no code called. (D.I. 175 at 6-8.)

Highlighting the weaknesses in Mr. Hunt's account, a parade of witnesses testified that nothing out of the ordinary occurred on September 17th. For example, Correction Officer Angelo D'Aniello, who was on duty on September 17th, testified that he did not recall anything unusual happening that night and that there was no incident. (D.I. 175 at 184.) Lieutenant Farrington, a member of the security team that day, similarly testified that no altercation occurred while he was on duty. (*Id.* at 193-94.) Furthermore, Mr. Hunt claimed that he told Carmen Davis that an officer struck him. (*Id.* at 186-87.) At the time of the alleged altercation between Mr. Hunt and Mr. Emig, Ms. Davis was a nurse at HRYCI. (*Id.*) She treated Mr. Emig for a broken jaw. (*Id.*) Contrary to Mr. Hunt's claim, however, Ms. Davis⁴ testified that he had informed her that his injuries were due to his cellmate punching him without warning.⁵ (D.I. 172 at 20-21 (Explaining that Mr. Hunt stated that his cellmate "stole" him.).)

Considering the inconsistencies in Mr. Hunt's testimony and the indications that he was not credible, it is very doubtful that Exhibit D-14 was the primary or a significant reason why the jury ultimately believed Mr. Emig's account over Mr. Hunt's. Indeed, Mr. Hunt's problematic

---

³ As Mr. Hunt explained during an interview with an Internal Affairs investigator that was discussed at trial, "usually when any altercation comes up, when someone is hit, or the guard has to rough someone up, there is a code called, like a Code 1 is for officer assaulted by an inmate." (D.I. 175 at 7.)

⁴ By the time of the trial, Ms. Davis was known as Ms. Morgan.

⁵ As Mr. Hunt points out, (D.I. 182 at 9), Sergeant Howard Kennedy testified that he was present in the infirmary when Ms. Davis examined Mr. Hunt and that he did not hear Mr. Hunt say that his cellmate struck him. (D.I. 175 at 75-76.) This does not change the fact that Ms. Davis's testimony was one of the pieces of evidence that the jury could have found convincing and on which it could have based its decision.

7

testimony played out before the jury for two of the three days of trial, making it quite memorable. Exhibit D-14, on the other hand, was discussed before the jury for only a few short minutes on the last day of trial. This further suggests that Exhibit D-14 cannot reasonably be deemed to have made anything except a minor contribution at most to the jury's overall perception of Mr. Hunt. There is no basis on which the court can rule that, if the admission of the Exhibit was an error, this error was anything except harmless.

## V. CONCLUSION

For the foregoing reasons, the court will deny Mr. Hunt's Motion for a New Trial. (D.I. 176.)

Dated: August 26, 2014

UNITED STATES DISTRICT JUDGE

8